**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**
_____

**EMESE M. VARGA,**

                          **Plaintiff,**

   vs.                                                  3:10-cv-559
                                                                      (MAD/DEP)

**RENT-A-CENTER EAST, INC.,**

                          **Defendant.**
_____

**APPEARANCES:**                                    **OF COUNSEL:**

**FINKELSTEIN & PARTNERS, LLP**          **ANDREW J. GENNA, ESQ.**
Newburgh Office                               **ELEANOR L. POLIMENI, ESQ.**
1279 route 300
Newburgh, New York 12550
Attorneys for Plaintiff

**SMITH, MAZURE LAW FIRM**               **MARK D. LEVI, ESQ.**
111 John Street
20th Floor
New York, New York 10038
Attorneys for Defendant

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

     Currently before the Court are Plaintiff's motion to strike Defendant's affirmative defense of nonuse of a seatbelt and Plaintiff's motion to exclude the opinions and testimony of Defendant's two biomechanical experts.

## II. BACKGROUND

On April 29, 2010, at the intersection of State Highway 206 and County Route 17, in the Town of Bainbridge, New York, Plaintiff was in a motor vehicle accident. At the time of the accident, Plaintiff had been operating her 1994 Subaru Legacy eastbound on State Highway 206, when it was caused to collide with Defendant's Chevrolet box truck, which had been proceeding southbound on County Route 17.

As a result of the accident, Plaintiff contends that she sustained serious physical injuries, including, among other things, a comminuted fracture of the right ankle, a comminuted fracture of the right distal tibia, an intra-articular fracture of the right medial malleolus, a fracture of the right posterior malleolus, a fracture of the right fibula, a comminuted fracture of the right patella requiring surgery with open reduction and internal fixation, multiple left rib fractures, a left-sided pleural effusion requiring the insertion of a chest tube, and a subarachnoid hemorrhage.

On May 13, 2010, Plaintiff commenced this personal injury action. On June 8, 2010, Defendant filed its answer, in which it asserted nonuse of a seatbelt as an affirmative defense.

## III. DISCUSSION

**A.   Plaintiff's motion to strike Defendant's affirmative defense**

In its answer, Defendant's Fourth Affirmative Defense reads as follows: "That the plaintiff was not wearing a seat belt at the time of the alleged occurrence and accordingly, any award made to and accepted by said plaintiff for injuries set forth in the complaint must be reduced in such proportion to the extent that the injuries complained of were caused, aggravated or contributed to by plaintiff's failure to wear a seat belt and to have same operational at the time of the occurrence." *See* Dkt. No. 5 at 4. Plaintiff claims that the Court should strike this affirmative

defense because she has been exempt from the requirement to wear a seat belt since 2001 due to a physically disabling condition. *See* Dkt. No. 32 at 6.[1]

Federal Rule of Civil Procedure 12(f) permits the court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Motions to strike affirmative defenses are generally disfavored. *See, e.g. MTA Metro–North R.R. v. Buchanan Marine*, No. 3:05–CV–881, 2006 WL 3544936, *3 (D. Conn. Dec. 8, 2006) (citing *William Z. Salcer, Panfeld, Edelman v. Envicon Equities*, 744 F.2d 935, 938-39 (2d Cir. 1984), *vacated on other grounds*, 478 U.S. 1015 (1986)).

Courts in the Second Circuit have adopted a three-part analysis in determining whether to grant a motion to strike an affirmative defense. "'Plaintiffs must establish that: (1) there is no question of fact which might allow the defense to succeed; (2) there is no question of law which might allow the defense to succeed; and (3) the plaintiff would be prejudiced by inclusion of the defense.'" *Marshall v. New Horizons*, No. 3:08–CV–633, 2009 WL 2983169, *1 (D. Conn. Sept. 14, 2009) (quotation omitted); *see also Texas 1845 LLC v. Wu Air Corp.*, No. 11-CV-1825, 2012 WL 382828, *6 (E.D.N.Y. Feb. 6, 2012) (quotation omitted).

In the present matter, Plaintiff argues that the Court should grant its motion to strike Defendant's Fourth Affirmative Defense because New York's Vehicle and Traffic Law excuses an occupant of a vehicle from wearing a seatbelt if the occupant has a physically disabling condition which has been duly certified by a physician.

Plaintiff is correct that an exception applies to New York's general requirement that a motor vehicle's driver must use a safety belt while operating the vehicle. *See* N.Y. Veh. & Traf.

---

[1] To avoid confusion, anytime the Court references a specific page number for an entry on the docket, it will cite to the page number assigned by the Court's electronic filing system.

3

Law § 1229-c(7). Specifically, this exclusion provides that New York's general safety belt requirement "shall not apply to a passenger or operator with a physically disabling condition whose physical disability would prevent appropriate restraint in such safety seat or safety belt provided, however, such condition is duly certified by a physician who shall state the nature of the handicap, as well as the reason such restraint is inappropriate." *Id.*[2]

In support of her motion, Plaintiff contends that she had a note from her doctor which satisfied the statute's requirements, but that this note was in the glove compartment of her vehicle which was totaled in the accident. Therefore, at Plaintiff's request, Plaintiff's treating physician drafted a document entitled "Certification," which provides as follows: "Ms. Varga has a physically disabling condition, that is post herpetic neuralgia. This condition existed on 4/29/10. The use of a safety belt restraint is inappropriate for Ms. Varga due to the pain that would result from such use as a result of Ms. Varga's post herpetic neuralgia condition." *See* Dkt. No. 33-7. This "Certification," however, was not sworn under penalty of perjury, notarized, or even dated. *See* 28 U.S.C. § 1746; *Link Treasure Ltd. v. Baby Trend, Inc.*, 809 F. Supp. 2d 1191, 1195 (C.D. Cal. 2011). Further, Dr. Butt failed to state how he has knowledge of Plaintiff's alleged disabling condition or whether he had "duly certified" her condition at the time of the accident. *See Link Treasure Ltd.*, 809 F. Supp. 2d at 1195.

---

[2] New York Vehicle and Traffic Law § 1229-c was enacted in 1984. This section codified New York's common law nonuse of a safety belt affirmative defense. Pursuant to the statute, "[n]on-compliance with the provisions of this section shall not be admissible as evidence in any civil action in a court of law in regard to the issue of liability but may be introduced into evidence in mitigation of damages provided the party introducing said evidence has pleaded such non-compliance as an affirmative defense." N.Y. Veh. & Traf. Law § 1229-c(8); *see also Stein v. Penatello*, 185 A.D.2d 976, 976 (2d Dept. 1992) (holding that "[i]t is well settled that failure to use an available seat belt is to be considered in mitigation of damages and should not be considered by the triers of fact in resolving the issue of liability" (citations omitted)).

In an earlier letter from Dr. Butt to Plaintiff's attorney, Dr. Butt informed counsel that Plaintiff was issued a note to exempt her from wearing a safety belt "some time ago in 2009," but states that, "[u]nfortunately, the copies are not available." *See* Dkt. No. 33-6 at 4. This letter, again, is not sworn under penalty of perjury or notarized, and does not state whether Plaintiff's written exemption was permanent or subject to renewal.

As Defendant correctly argues, there is no evidence in the record clearly establishing that Plaintiff had a duly certified exemption to New York's safety belt law at the time of the accident. As such, questions of fact preclude the Court from granting Plaintiff's motion to strike. *See* N.Y. Pattern Jury Instr. § 2:87, at 498 (3d ed. 2012) (noting in the Comment that "[i]f there is an issue of fact as to whether plaintiff's disability prevents the use of a seat belt, that issue should be submitted to the jury"). Moreover, the Court fails to see how Plaintiff would be prejudiced by Defendant presenting evidence in support of this affirmative defense. At trial, it will be left to the jury to decide whether Plaintiff had a duly certified exemption from New York's safety belt law at the time of the accident.

**B.     Plaintiff's motion to exclude Defendant's two biomechanical experts**

Plaintiff generally contends that Defendant's biomechanical experts' opinions should be excluded for the following reasons: (1) the opinions expressed in their report "are based upon flawed underlying assumptions concerning the facts of the accident in question and on assumptions that are contrary to the fundamental laws of physics and accepted engineering analysis methodologies;" and (2) the opinions expressed in their report "are not based on sound scientific methodology but instead on unfounded speculation, and there is no evidence that their opinions have been tested or are capable of being tested and verified." *See* Dkt. No. 35.

5

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence. That Rule provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

In reviewing the admissibility of expert testimony, "the district court has a 'gatekeeping' function under Rule 702 – it is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597, 113 S. Ct. 2786 (1993)).

As the Second Circuit has explained,

> [i]n fulfilling this gatekeeping role, the trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant, *i.e.*, whether it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Next, the district court must determine whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered. In this inquiry, the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case. In short, the district court must make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

*Amorgianos*, 303 F.3d at 265 (internal alterations, quotations, and citations omitted). Nevertheless, "experience in conjunction with other knowledge, skill, training or education . . . [may] provide a sufficient foundation for expert testimony," and "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702; *see also Kumho Tire*, 526 U.S. at 156 ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience").

"In undertaking this flexible inquiry, the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Id.* "In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.* "A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible." *Id.* "'The judge should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions.'" *Id.* (quotation and other citation omitted).

Defendant's biomechanical experts are Dr. Anastasios Tsoumanis and Dr. Richard Baratta, who prepared a joint report. Plaintiff's expert is Dr. David Gushue. In response to Plaintiff's expert response, Defendant supplemented its expert report. Plaintiff directs the Courts attention to several discrepancies between the experts' reports. After thorough review of the expert reports and supplemental material, the Court finds that Defendant's expert report is relevant and sufficiently reliable to permit Defendant to present this expert testimony at trial.

In the November 8, 2011 Supplemental Conclusions of Defendant's expert report, Dr. Tsoumanis provides the following conclusions:

> 1. The Subaru experienced a decrease in forward speed between 30 and 35 miles per hour as a result of this collision.
>
> 2. Proper use of the seatbelts would have minimized the forward body movement of the driver.
>
> 3. Proper use of the seatbelts would have reduced forward movement of the occupant's head, torso, and lower extremities.
>
> 4. Proper use of the seatbelt would most likely have decreased the severity of the contact of the occupant's knees with the instrument panel and hence decreased the potential severity for a fracture to the right patella. Even if contact with the dashboard had occurred, the forces would be substantially less than without seatbelt use, since the seatbelts would bear the majority of the inertial loads associated with the torso and lower body.
>
> 5. Proper use of the seatbelt would most likely have decreased the potential and severity for fracture to the left thoracic area ribs. From potential contact with the airbag, the contact forces would be far less than without seatbelt use, since the seatbelt would bear the majority of the inertial loads associated with the torso and lower body.
>
> 6. Proper use of seatbelt would most likely have reduced the potential for fracture of the right ankle and lower leg as it would have constrained the forward motion of the body and hence reduced inertial loading on the lower legs.
>
> 7. Proper use of seatbelt would have reduced the potential for subarachnoid hemorrhage. Usage of seatbelt would have most likely eliminated contact of the scalp/head with hard interior surfaces (such as windshield or steering wheel).
>
> 8. If Ms. Varga had been properly using her seatbelt, she would most likely been exposed to the potential for cervical, thoracic, shoulder, and lumbar strains and sprains, as well as abrasions and contusions from airbag deployment.

*See* Dkt. No. 52-17 at 19. Defendant's expert's report continues with the following accident reconstruction and analysis:

8

> There were no mechanical defects with the components available for inspection on the Chevrolet that could have caused or contributed to the collision. The right-front wheel assembly and brake were missing from the vehicle and could not be inspected. The damage to the right-front suspension and body of the Chevrolet was consistent with the Chevrolet colliding with the Subaru as described in the police report. The SDM data shows that at 2.5 seconds before the collision, the Chevrolet's brake petal switch was not activated, meaning the brake pedal was not being pressed. The SDM recorded also a non-deployment event. According to the SDM data, the brake switch was applied between approximately 2.5 and 2.0 second before impact and remained on until impact. The vehicle's speed was 55 miles per hour, the engine throttle was 41 percent, and the accelerator pedal position was at 0 percent approximately 2.5 seconds before the impact. One half second or less before impact the SDM recorded a vehicle speed of approximately 35 miles per hour while the maximum longitudinal and lateral velocity changes due to impact were: 8.67 miles per hour and 21.94 miles per hour respectively.
>
> Based on the severe damage to the vehicles, the pre-impact breaking and the downloaded data of the Chevrolet and analysis of NHTSA (National Highway Traffic Administration Agency) studies on the Subaru, the result of this contact was that the Subaru would have experienced a decrease in forward speed between 30 and 35 miles per hour.

*See id.* at 19-20.

Plaintiff and Dr. Gushue contend that Defendants' experts failed "to take into consideration critical evidence that there w[ere] two impacts between the vehicles in question and that there was a lateral change in velocity of the Plaintiff's Subaru due to the contact with Defendant's truck" and that failure to take into consideration this evidence renders their analysis fundamentally flawed. *See* Dkt. No. 35 at 10-12. Dr. Tsoumanis, however, addressed this contention in an affidavit and explains that it was the longitudinal decrease in speed of Plaintiff's Subaru that was the predominant factor in causing Plaintiff's injuries and that taking into consideration the lateral change in velocity would actually increase the overall change in velocity by two-to-three miles per hour. *See* Dkt. No. 52-1 at ¶¶ 7-9. In fact, Dr. Tsoumanis explains that

9

he did not consider the lateral velocity because "of its significantly lesser effect on the dynamics and mechanics of this accident" and because the injuries Plaintiff sustained were "clearly associated with her impact with frontal structures, such as the dashboard and steering wheel, and the floor panel and pedals, not lateral structures, such as the car door[.]"  *See id.* at ¶¶ 8, 10.

      Plaintiff further argues that Defendant's experts based the analysis in their report "not on the type of seatbelt that was involved in the Subaru Legacy in question, but on a vehicle equipped with a 'standard three-point seatbelt system[.]'"  *See* Dkt. No. 35 at 13.  Plaintiff claims that her Subaru Legacy was equipped with "'an automatic motorized shoulder belt and a separate manual lap belt.'"  *See id.* at 14.  Apart from pointing out this alleged inconsistency, Plaintiff does little to explain how this impacts Dr. Tsoumanis and Dr. Baratta's analysis.  In Dr. Tsoumanis' February 16, 2012 supplemental report and affidavit, he explains that in his initial report he only made reference to a "lap belt and shoulder harness," and did not use the term "three-point seatbelt."  *See* Dkt. No. 52-1 at ¶ 13.  Moreover, Dr. Tsoumanis explains that Dr. Gushue used a woman in his surrogate fit study who was approximately sixty-seven inches and 175 pounds, while Plaintiff was approximately 230 pounds at the time of the accident, thereby accounting for several discrepancies pointed out by Plaintiff.  *See* Dkt. No. 52-19 at 8.  Dr. Tsoumanis continues in his supplemental report and affidavit to explain other inconsistencies between the parties' expert's reports and references tests on the Subaru Legacy conducted by the New Car Assessment Program under similar conditions and explains the effects these tests had on the crash dummies in various scenarios.  *See id.* at 9-11.

      Finally, contrary to Plaintiff's assertions, Dr. Tsoumanis and Dr. Baratta's report was not "purely speculative" and does not "lack any indicia of reliability because the experts failed to follow any valid and accepted scientific methodology."  Defendant's experts relied on numerous

10

publications and tests, some of which were relied on by Plaintiff's expert.

While many of Plaintiff's contentions are sensible, they simply go to the weight of Defendants' experts' testimony and do not provide a basis for exclusion. *See Demar v. D.L. Peterson Trust*, No. 1:05-cv-103, 2006 WL 2987314, *5 (N.D.N.Y. Oct. 13, 2006) (permitting the testimony of Dr. David Gushue regarding the effect of seatbelt use to challenge and discredit the defendant's expert and the methodologies he used in reaching his conclusions). Although Dr. Tsoumanis' supplemental report and affidavit provide a more thorough explanation of the methods used and indicate more clearly the tests and studies relied upon, it is clear that both his initial report and supplemental report rest on a sufficiently reliable foundation and are relevant to the issues presented. *See Amorgianos*, 303 F.3d at 265 (citation omitted); *see also Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995) (holding that the Supreme Court in *Daubert* "expressed its faith in the power of the adversary system to test 'shaky but admissible' evidence, . . . and advanced a bias in favor of admitting evidence short of that solidly and indisputably proven to be reliable" (quotation omitted)).

Based on the foregoing, Plaintiff's motion to exclude the opinions and testimony of Defendant's two biomechanical experts is denied.

### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiff's motion to strike Defendant's affirmative defense (Dkt. No. 31) is **DENIED**; and the Court further

**ORDERS** that Plaintiff's motion to exclude the opinions and testimony of Defendant's two

biomechanical experts (Dkt. No. 34) is **DENIED**; and the Court further

**ORDERS** that counsel for both parties shall be available for a telephone conference on **June 21, 2012 at 10:30 a.m.**, to discuss a date for the trial of this matter. Defendant's counsel shall initiate the call using a professional conferencing service; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: June 13, 2012
       Albany, New York

_____
Mae A. D'Agostino
U.S. District Judge